# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | DIVISION ONE |
| Respondent, | |
| | No. 73967-1-I |
| v. | |
| | UNPUBLISHED OPINION |
| GREGORY LEE BONDS, | |
| Appellant. | FILED: December 28, 2015 |

DWYER, J. — Two principles control the decision in this case. First, statements to law enforcement officers do not implicate the Sixth Amendment's confrontation clause where those statements are made under conditions that, viewed objectively, considering all of the relevant circumstances, indicate that the primary purpose of the declarant's encounter with the police was other than to create a substitute for trial testimony. Second, where a proffered defense witness is barred from testifying, appellate relief is not warranted unless the proposed testimony was shown to be material, probative, and favorable to the defense. In this case, the trial court correctly ruled that proffered evidence of a deceased person's out-of-court statements was not testimonial and, therefore, not subject to exclusion based on an absence of confrontation. Additionally, although a proposed defense witness was wrongfully excluded, the necessary demonstration of relevance and favorability was not made. Accordingly, we affirm.

I

Gregory Bonds and Antoinette[1] were formerly husband and wife. On August 28, 2007, the superior court entered a protection order prohibiting Bonds from having contact with Antoinette for 10 years. The protection order was a condition of a sentence imposed in a criminal matter.

On May 19, 2013, Antoinette's daughter, Veatrice Jordan, was downstairs in the kitchen of the home in which she resided with her mother and her nephew, Demarcus Tate. Jordan was cooking dinner at the stove with her back to an open, sliding glass door. Tate and Treyvion Tucker[2] were nearby, watching television. Antoinette was standing—facing Jordan—in a hallway. She was talking to Jordan and watching television.

While Jordan was cooking, she heard Bonds yell, "where is that bitch, fucking bitch[?]" Jordan "turned and looked" to see Bonds "running" through the open sliding glass door and "charg[ing]" at her mother. She saw Antoinette put her hands up as Bonds "slap[ped] her across the face and hit her upside the head." Jordan "was not counting" how many times her mother got hit. She told Bonds that she was going to call 911 and began searching for a telephone.

Upon locating Antoinette's cellular phone, Jordan telephoned 911.

While Jordan was on the telephone with the dispatcher, she told Tate and Tucker to go upstairs. From her vantage point, Jordan saw Bonds grab

_____

[1] Antoinette has been known by three different surnames: Weekly, Bonds, and Jordan. For clarity, Antoinette will be referred to by first name. All other persons will be referred to by last name.

[2] Tucker is Bonds' grandson.

Antoinette by the arm, drag her "outside and put her up against the house and start[ ] punching her" with "both hands," "all over her whole body. . . . all on the side." Antoinette's body was "down low," in a "crunched" position, with her arms placed over her head in order to cover her face. When Bonds hit Antoinette in the stomach, "[s]he fell back against the house."

Bonds then turned around, started walking away, and "grabbed an object."[3] With the object in hand, Bonds turned to face Antoinette, and it appeared to Jordan that he "threatened her" with it. Bonds then turned around and walked away. He got into a vehicle and left the scene.

Antoinette then ran inside the house. As Antoinette passed by, she said to Jordan that "this mother fucker's trying to kill me." Jordan was still on the telephone with the 911 dispatcher so she did not speak to her mother or see where she went. Jordan told the dispatcher that Bonds had a weapon.[4] She did not inform the dispatcher that Bonds had left the scene.

Two minutes after Jordan telephoned 911, Tacoma police officer Brandon Showalter arrived at the house with his partner.[5] Showalter had the limited knowledge that a domestic violence incident had occurred, with a "request for someone needing immediate help," and that a weapon was involved.

---

[3] In response to a question asking Jordan if she saw what Bonds picked up, she testified that "[i]t was a -- actually to tell you the truth, I'm not going to sit and lie. I don't know if it was a potted plant, a brick or something."

[4] In response to a question asking Jordan if she told the 911 operator what weapon Bonds had, Jordan testified,

> I said it was an object. I didn't -- I didn't say it was a -- nothing. I didn't say it was nothing. They said did he have a weapon[?] I said yes. I said he had an object.

[5] Showalter's partner, Officer Lang, did not testify at trial.

- 3 -

Showalter and his partner entered the house. Showalter spoke with Jordan and two young males, who identified themselves as Demarcus Tate and Marcus Mayers.[6] Showalter asked Jordan if anyone else was inside the house, to which she responded "no."

Over the next few minutes several more officers arrived at the scene, including John Moses. Moses also had the limited knowledge that the incident involved "domestic violence with a weapon."

Once inside the house, Moses and several other officers performed a security check of the downstairs area. Bonds was not located. Moses was then stationed near the front door of the house, at the bottom of the stairs. He was soon informed by Showalter that the upper floor needed to be "cleared."[7] Showalter and Moses then "drew [their] weapons and went upstairs to clear the upper part of the residence."

Moses recalled that when they entered a bedroom "[i]t was very quiet." As he pulled open a closet door, "to [Moses'] shock, there was a face that appeared through the clothing." Moses could see that it was the face of a female, later identified as Antoinette, who "appeared to be just afraid, very terrified." He noticed that "[h]er eyes were really large. She looked very fearful, looked terrified. Her face was wet, and it was -- turned out it was from tears coming down her face."

---

[6] At an evidentiary hearing, counsel for both parties discovered that Tucker had falsely identified himself as "Marcus Mayers" to Showalter.

[7] In response to a question asking Moses what it means to clear a residence, he testified that "[w]e check behind doors, every closet, every room in the house to make sure there's no threats."

Consistent with Moses' observations, Showalter could see that "[Antoinette] appeared terrified. She was visibly upset. She was shaking. She was in a defensive posture, hunched over, and [that] she would not make eye contact with [Showalter] or communicate with [him]."

Moses ordered Antoinette out of the closet several times but he received "no response from her. She just kind of stared off into the distance and -- like she was in shock." At the same time, Showalter was "asking [Antoinette] to identify herself," but he also received no response from her.

Moses and Showalter eventually had to "physically pull her out" of the closet. As a safety measure, Showalter restrained Antoinette and escorted her to a downstairs living room. He later removed the handcuffs after she identified herself by name. Moses continued to secure the rest of the upper floor. He did not ask Antoinette any questions.

Showalter questioned Antoinette in the living room of the house about what had happened. Police officers continued to search for Bonds. They were not able to locate him on May 19. He was arrested approximately two weeks later.

On June 3, the State charged Bonds with four felony offenses in connection with the incident on May 19. The original charges were amended three times. The last amended information charged Bonds with one count each of burglary in the first degree, felonious violation of a court order, felony harassment, and two counts of witness tampering.

On June 13, 2013, Antoinette died.

- 5 -

On February 7, 2014, the parties appeared before the trial judge in order to address preliminary matters. The State moved to have declared admissible certain oral statements made by Antoinette to Showalter on May 19.[8] The trial court heard argument from both sides. The State asserted that Antoinette's statements did not violate Bonds' Sixth Amendment right of confrontation because the statements were nontestimonial pursuant to Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), and were admissible as excited utterances under the rules of evidence. ER 803(2). Bonds' counsel disagreed.

The trial court deferred ruling and set an evidentiary hearing for February 26. On that date, the prosecutor informed the trial judge that "I'm in the process of trying to arrange for both of those officers to be present tomorrow morning." With permission from the court, the parties agreed to resume with the evidentiary hearing on the following day. The trial judge then heard arguments and ruled on the parties' remaining pretrial motions. In ruling on one such motion, the court

---

[8] The court clarified which statements the State sought to admit:
    THE COURT: You're asking for those statements that were made by her after she was removed from the closet --
    MS. WILLIAMS [Prosecutor]: Yes.
    THE COURT: -- interviewed in the bedroom where that closet [sic] took place --
    MS. WILLIAMS: Yes.
    THE COURT: -- and then -- and everything that occurred or everything she said during that particular interview?
    MS. WILLIAMS: She does make some statements about strike two, about the prior assault, that the State would concede would not be properly admitted in the trial itself. But everything pertaining to what she said, and there was only a handful of statements that she -- it was the defendant, that he entered the house, that he started beating her and screaming at her and that essentially, you know, he fled. So it's very brief.
    The State did not seek to have declared admissible a notarized, written statement that Antoinette had provided to the police.

- 6 -

granted a joint motion in limine to exclude all witnesses from the courtroom until they had testified.

The next day, the State called two witnesses. Showalter testified that when Antoinette was seated in the living room,

> she was still terrified. She still was scared. She still -- she wouldn't make eye contact with me. She was hunched over in the chair. She was still kind of shaking and just unresponsive.

Showalter "gave her a moment" before he "knelt down beside her" to make her "feel as comfortable as she could" and started to question her. Showalter recalled that Antoinette stated,

> that Mr. Bonds arrived and forced his way inside the house. She believed that he was high on meth, and he was screaming and yelling and just really angry. He made the comment -- he told her, bitch, I'm going to fuck you up. And then he grabbed her, and she said that she was -- he was choking her and he was striking her.
> She said she was -- she believed that this was related to a previous incident, a previous case, where she testified against him, and she felt that he was there for retaliation due to that. The fight ensued.
> I believe Veatrice at that time called 911, and Antoinette said she was able to break free. And at that point, she ran upstairs and hid in the closet. Then she kept repeating to me at the time that, he's going to kill me, he's going to kill me, he's going to kill me. She kept repeating that. And the whole time she just -- even with those statements, it wasn't -- it wasn't like I'm talking to you now.
> She was scared. She was -- she wouldn't make eye contact with me. She was looking at the floor. She was still shaky. She -- you know, just had that wide-eyed kind of dazed look stare in her eyes, and she was whispering. She just was real quiet when she spoke.

As a result of his conversation with Antoinette, Showalter was concerned that Bonds might return to Antoinette's house. In addition, he

No. 73967-1-I/8

was concerned that Bonds posed a continuing threat to the community.
Showalter testified that his concern for the public was

> [d]ue to [Bonds'] just disregard for the safety of the people at that
> house. I believed that if he was to disregard their safety, he
> probably would disregard anybody else's.

Showalter recalled that the nature or extent of the threat that Bonds
posed to the public was unknown at the time because he

> wasn't sure what state Mr. Bonds was in. [Antoinette] did mention
> that she believed that he was high on meth. I wasn't able to
> confirm that, but due to the fact of my experience and knowledge
> that people who are high on meth, they don't make rational
> decisions. If he had already made the decision to break into
> someone's house and assault someone, then I wasn't sure what
> else he would do.

Moses testified that seeing Antoinette's terrified demeanor "intensified [his]
search even more" when he returned to his patrol car. He recalled thinking that
"it would be prudent for me to find the suspect involved before he could harm
anybody else or return to the scene."

After hearing testimony and listening to the argument of counsel, the trial
judge ruled that Antoinette's oral statements to Showalter were nontestimonial
and that the statements "were truly excited utterances still under the influence of
the event and, in the Court's opinion, have a high indicia of reliability under the
facts of this particular circumstance." The trial judge admitted Antoinette's
statements in accordance with his ruling.[9]

---

[9] The judge did make certain redactions to Antoinette's statements. He declined to admit
Antoinette's statement regarding Bonds' alleged methamphetamine use as unduly prejudicial
pursuant to ER 403. In addition, for the same reason, he excluded Antoinette's statement about
Bonds' potential motive.

- 8 -

At the end of the evidentiary hearing, Bonds' counsel, Kent Underwood, alerted the trial judge to an incident that had occurred during a recess in the hearing.

> The other issue that I would like to address, as the Court may have noticed – although the Court can see there's one person in the gallery, and earlier there was a second person in the gallery. During our recess, I went to the restroom, and the second person who was in the gallery I just ran across in the restroom, and he asked me if I was Mr. Bonds' attorney. I said yes, and he said that he was Treyvion Tucker. He was the second person, the second youth, that was in the house. Apparently there was a different name used at that time, but Treyvion told me he was in the house, and he had some comments about the accuracy of what he had heard.
>
> Now, when he was here, I didn't know that he was a potential witness. I didn't know who he was. I have actually been looking for the second person, but given the different name, et cetera, I didn't pursue that too much. But I have interviewed the first person who was in the -- or the other youth in the room. That's Demarcus Tate, and I understand the State's going to be calling her -- him, and I would be calling him if the State doesn't. So I'm bringing that one to the Court's attention, and I have already advised counsel.
>
> *There were three -- four statements that Treyvion said that I was particularly interested in. One, he was in the house when the police arrived, that Antoinette hid because she had a warrant. Everything that Veatrice said was a lie. Antoinette did not want to give a statement until after Veatrice did, and then Antoinette reluctantly gave a statement.*
>
> I think that Mr. Tucker should be allowed to be called as a witness, at least during the defense's case, even though he was here for this preliminary hearing.

(Emphasis added.)

In response to Underwood's request, the trial judge stated:

---

As to all witnesses, the trial judge declined to admit evidence of prior bad acts and any reference to criminal history, including warrant history.

Well, he's heard things he would never have heard. He's heard critical testimony from an officer that he now has an opportunity to testify to in response that he would never have had an opportunity to know before he got on that stand.

Angelica Williams, the prosecutor, then interposed:

And also if I may, Your Honor, just by way of background, the second youth identified by law enforcement -- because they identified both of them -- was Demarcus Tate and Marcus Mayers. They did not identify this youth who's now come forward on day two of trial after sitting in and listening to the officers' testimony and who comes forward to Mr. Underwood -- and please understand, I'm not accusing Mr. Underwood of anything. What I am accusing this youth of doing is essentially lying to try and save his family member. Now he's come forward and saying Antoinette had a warrant, which how would he know that?

Number two, that everything Veatrice said was a lie. So everything that he's giving to Mr. Underwood in this bathroom conversation are things that are going to help his family member when he wasn't even there. He was not in that house. They identified every single person in that house, and he wasn't there.

So given that circumstance, given the fact that he was present in court listening and it was only until after he heard the testimony that he approached Mr. Underwood, obviously this smacks of just foul play, Your Honor.

The State would ask that this youth be excluded.

The trial judge then asked some questions of Underwood and

Williams.

THE COURT: If he was in the house, why wouldn't the officer have contacted him?

MR. UNDERWOOD: Well, the officer did contact him. He gave a false name.

THE COURT: What false name did he give?

MS. WILLIAMS: Your Honor, I asked Mr. Underwood that, if he asked this youth if he identified him as Marcus Mayers, and Mr. Underwood told me he did not ask the youth that.

MR. UNDERWOOD: I didn't. I found that after -- actually after we spoke.

Immediately following this discussion, the trial judge ruled:

- 10 -

Okay. Well, Counsel, I know what your reaction would be if the State brought in a witness under the same circumstances. And I can tell you clearly I would never allow the State to bring in somebody who sits in a courtroom and hears one of your witnesses testify and then says oh, by the way, I was there -- for whatever reason, I gave them a false name, et cetera – to testify. The trial's started.

If he knew he was going to be a witness, he had an obligation to let you know right off the bat, but to sit here throughout the trial, this crucial hearing, which is one of the -- is the critical phase of the case in terms of admissions from this individual, I just think it would be a miscarriage of justice to allow that to occur under every rule that I can think of in terms of wanting to hear a witness who is not prejudiced or has no bias and is uninfluenced by the testimony of any other witness and every one of those basic rules of even just our own motion in limine to exclude witnesses.

So I can certainly understand you bringing this to the Court's attention, but it would be a flagrant violation of our motion in limine, and I just have serious questions under the circumstances as to how this all came about in terms of whether he was in the house, who he really is, and why he didn't come forward months ago in order to assist someone that he obviously has opinion about.

So I'm going to decline to allow him to be added to your witness list based on the timeliness of it and the fact that he – there's been a gross violation of the motion in limine to exclude all witnesses.

Following this ruling, Underwood sought clarification from the trial

judge.

MR. UNDERWOOD: And, Your Honor, just – I don't know whether Mr. Tucker thought he would be called as a witness or not, so I think the Court's indicated that maybe he thought he might be called as a witness. I don't know that he thought that.

THE COURT: Well, if he was actually present in the home, was there when the police officers were interviewing all of these people and he believed that all of this was -- all of these things that were said by these critical witnesses were all untrue or were motivated by some other issue other than the assault that just took place, I think the Court's free to speculate as to why someone like that, who would be so critical and helpful to the defense, would not be there on day two saying I assume you're his attorney. I want to talk to you. Here's what I have to say. I think it would be important to your client. And I think that would be a reasonable inference

based on what you have gave me as far as an offer of proof that he had as to after hearing what was said here.

So that is part of my concern, is that this is something that I think I'm free to infer would have been something that would have been brought to your attention months and months ago because of how important that information would have been if, in fact, he had it. But to not disclose himself or to make himself known to you except under these circumstances, all I'm trying to say, Counsel, is it raises concerns about his veracity in general, not including the fact that he heard things that he wasn't supposed to hear as a potential witness. So I just want to make that clear.

On March 4, the State called and questioned three witnesses. The next day, at the conclusion of another State witness's testimony, defense counsel moved for a mistrial. The trial court granted the motion.[10]

In preparation for a second trial, on March 11 the parties appeared before the same judge to address preliminary matters. At the outset, the judge stated that "[m]y rulings on the pretrial motions obviously are not going to change. We did enter into -- I did sign a final order on motions in limine, so we have a record of what those decisions were."

The second trial was held from March 13 to March 19. Over the course of the trial, the jury heard from a total of eight witnesses, including Moses, Showalter, and Bonds. In addition, the jury heard testimony and recordings of several jail telephone calls pertaining to the witness tampering charges.

On March 20, the jury found Bonds guilty of felonious violation of a court order, felony harassment, and two counts of tampering with a witness. In addition, the jury found Bonds guilty of assault in the fourth degree—a lesser included offense of the burglary in the first degree charge—and found that the

---

[10] The trial judge's decision to grant a mistrial is not challenged on appeal.

aggravating factor that Antoinette and Bonds were members of the same family or household had been proved.

Bonds was sentenced to an exceptional sentence totaling 120 months of confinement. Bonds now appeals.

## II

Bonds contends that the trial court's admission of certain out-of-court statements made by Antoinette to Showalter violated his Sixth Amendment right of confrontation. This is so, he asserts, because the statements "were made primarily to provide information about past events and there was no ongoing emergency," Br. of Appellant at 1, and were, therefore, testimonial pursuant to Crawford, 541 U.S. 36. We disagree.

"A confrontation clause challenge is reviewed de novo." State v. Koslowski, 166 Wn.2d 409, 417, 209 P.3d 479 (2009).

"The Sixth Amendment provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" Koslowski, 166 Wn.2d at 417 (alterations in original) (quoting U.S. CONST. amend. VI). "[T]he Sixth Amendment's right of an accused to confront the witnesses against him . . . is made obligatory on the States by the Fourteenth Amendment." Pointer v. Texas, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965).[11]

---

[11] "Article I, section 22 of the Washington Constitution also guarantees criminal defendants the right to confront and cross-examine witnesses against them. However, as [the defendant] made no arguments based on the state constitution, we do not address the state constitution here." State v. Ohlson, 162 Wn.2d 1, 10 n.1, 168 P.3d 1273 (2007).

> In its watershed 2004 decision, Crawford [,541 U.S. 36], the United States Supreme Court reformulated the analysis of confrontation clause claims. Crawford explained that the confrontation clause "bars 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'"

State v. Ohlson, 162 Wn.2d 1, 10, 168 P.3d 1273 (2007) (quoting Davis v. Washington, 547 U.S. 813, 821, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006) (quoting Crawford, 541 U.S. at 53-54)).

Neither party disputes that Antoinette was unavailable to testify or that Bonds had no prior opportunity to cross-examine her. The central issue, then, is whether the admitted statements were testimonial.

"Testimony" is typically defined as "'[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" Crawford, 541 U.S. at 51 (alteration in original) (quoting 2 N. WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828)). In Crawford, the Supreme Court expressly declined to offer a comprehensive definition of "testimonial" but declared that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." 541 U.S. at 68. Subsequently, the Court has, on several occasions, more fully explicated on the characteristics of testimonial statements in the context of police interrogations.

In Davis v. Washington and Hammon v. Indiana, which were consolidated and decided together, 547 U.S. 813, the Court specifically addressed whether certain statements made by victims of domestic violence were testimonial. In

- 14 -

answering this question, the Court articulated "what has come to be known as the 'primary purpose' test,"[12] declaring that,

> [s]tatements are nontestimonial when made in the course of police interrogation under the circumstances objectively indicating that the primary purpose of interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

Davis, 547 U.S. at 822.

The challenged statements in Davis were made to a 911 dispatcher, before police arrived, during an ongoing emergency, and the information elicited was necessary to resolve the ongoing emergency. Davis, 547 U.S. at 827. The challenged statements in Hammon, although made in an informal setting, were elicited after police officers had arrived, physically separated the declarant from her alleged abuser, and were told that everything was "fine," and resulted from being recorded in the declarant's "battery affidavit." Davis, 547 U.S. at 819-20. After applying the primary purpose test, the Court held that the statements in Hammon were testimonial while the statements in Davis were not. 547 U.S. at 828-30.

Five years later, in Michigan v. Bryant, 562 U.S. 344, 359, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011) (quoting Davis, 547 U.S. at 822), the Court explained that,

> [w]e now face a new context: a nondomestic dispute, involving a victim found in a public location, suffering from a fatal gunshot

---

[12] Ohio v. Clark, 576 U.S. ___, 135 S. Ct. 2173, 2179, 192 L. Ed. 2d 306 (2015).

- 15 -

wound, and a perpetrator whose location was unknown at the time the police located the victim. Thus, we confront for the first time circumstances in which the "ongoing emergency" discussed in Davis extends beyond an initial victim to a potential threat to the responding police and the public at large. This new context requires us to provide additional clarification with regard to what Davis meant by "the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency."

Given this new context, the Court took the opportunity to clarify that the primary purpose test is an objective inquiry. Bryant, 562 U.S. at 360. It requires that "we *objectively evaluate* the circumstances in which the encounter occurs and the statements and actions of the parties." Bryant, 562 U.S. at 359 (emphasis added). Indeed,

> [a]n objective analysis of the circumstances of an encounter and the statements and actions of the parties to it provides the most accurate assessment of the "primary purpose of the interrogation." The circumstances in which an encounter occurs—*e.g.,* at or near the scene of the crime versus at a police station, during an ongoing emergency or afterwards—are clearly matters of objective fact. The statements and actions of the parties must also be objectively evaluated. That is, the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred.

Bryant, 562 U.S. at 360.

When engaging in this objective inquiry, "courts should look to all of the relevant circumstances." Bryant, 562 U.S. at 369. Such relevant circumstances may include the conditions under which the statements are made, "the statements and actions of both the declarant and interrogators," the declarant's physical condition, and the existence of an ongoing emergency. Bryant, 562 U.S. at 367-70.

- 16 -

In fact, "the existence of an 'ongoing emergency' at the time of an encounter between an individual and the police is among the most important circumstances informing the 'primary purpose' of an interrogation." Bryant, 562 U.S. at 361.

> The existence of an ongoing emergency is relevant to determining the primary purpose of the interrogation because an emergency focuses the participants on something other than "prov[ing] past events potentially relevant to later criminal prosecution." Davis, 547 U.S. at 822. Rather, it focuses them on "end[ing] a threatening situation." [Davis,] at 832.

Bryant, 562 U.S. at 361. In this way, "statements made to assist police in addressing an ongoing emergency presumably lack the testimonial purpose that would subject them to the requirement of confrontation." Bryant, 562 U.S. at 370.

However, "the existence vel non of an ongoing emergency is not the touchstone of the testimonial inquiry." Bryant, 562 U.S. at 374. Indeed, "whether an ongoing emergency exists is simply one factor—albeit an important factor—that informs the ultimate inquiry regarding the 'primary purpose' of an interrogation." Bryant, 562 U.S. at 366. Hence, the Court recognized that, "there may be other circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony." Bryant, 562 U.S. at 358. In this regard, the Court acknowledged that a statement can have more than one purpose. If, after considering all of the relevant circumstances, the primary purpose of a statement is something other than a desire to create a record for trial the statement is nontestimonial, Bryant, 562 U.S. at 358, and "the admissibility of [the] statement

is the concern of state and federal rules of evidence, not the Confrontation Clause." Bryant, 562 U.S. at 359.

After clarifying the objective and expansive reach of the primary purpose inquiry, the Court held that the declarant's statements to police, providing a description of the shooter and the location of the shooting, were nontestimonial because all of the relevant circumstances "objectively indicate that the 'primary purpose of the interrogation' was 'to enable police assistance to meet an ongoing emergency.'" Bryant, 562 U.S. at 349 (quoting Davis, 547 U.S. at 822). Ultimately, the Court was persuaded that the circumstances surrounding the declarant's challenged statements, when viewed objectively, demonstrated both a continuing threat to the victim and a threat to the general public. Bryant, 562 U.S. at 372-74.

Last term, in Ohio v. Clark, 576 U.S. ___, 135 S. Ct. 2173, 192 L. Ed. 2d 306 (2015), the Court applied the primary purpose test to out-of-court statements made by a child to school personnel declaring that he was a victim of abuse. The context of "statements [made] to persons other than law enforcement officers," Clark, 135 S. Ct. at 2181, provided the Court an opportunity to clarify many of the principles it set forth in Bryant.

The Court emphasized, once again, that the primary purpose test is an objective inquiry that "must consider 'all of the relevant circumstances.'" Clark, 135 S. Ct. at 2180 (quoting Bryant, 562 U.S. at 369). In addition, the Court discussed that, in Bryant,

> we reiterated our view [from] Davis that, when "the primary purpose of an interrogation is to respond to an 'ongoing emergency,' its purpose is not to create a record for trial and thus is not within the scope of the [Confrontation] Clause." [Bryant,] 562 U.S. at 358. At the same time, we noted that "there may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony." [Bryant,] 562 U.S. at 358. "[T]he existence *vel non* of an ongoing emergency is not the touchstone of the testimonial inquiry." [Bryant,] 562 U.S. at 374. Instead, "whether an ongoing emergency exists is simply one factor . . . that informs the ultimate inquiry regarding the 'primary purpose' of an interrogation." [Bryant,] 562 U.S. at 366.

Clark, 135 S. Ct. at 2180. Remaining consistent with the views expressed in Bryant, "[i]n the end," the Court observed, "the question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.'" Clark, 135 S. Ct. at 2180 (alteration in original) (quoting Bryant, 562 U.S. at 358).

The Court evaluated the child's statements and concluded that the totality of the relevant circumstances, viewed objectively, indicated that "[the child's] statements occurred in the context of an ongoing emergency involving suspected child abuse." Clark, 135 S. Ct. at 2181. The Court noted that "the [teachers'] immediate concern was to protect a vulnerable child who needed help," that "their questions and [the child's] answers were primarily aimed at identifying and ending the threat," and that "[t]he teachers' questions were meant to identify the abuser in order to protect the victim from future attacks." Clark, 135 S. Ct. at 2181.

Looking at the primary purpose of the exchanges, the Court found it

irrelevant that the teachers' questions and their duty to report the matter had the natural tendency to result in Clark's prosecution. The statements at issue in Davis and Bryant supported the defendants' convictions and the police always have an obligation to ask questions to resolve ongoing emergencies. Yet, we held in those cases that the Confrontation Clause did not prohibit introduction of the statements because they were not *primarily intended* to be testimonial.

Clark, 135 S. Ct. at 2183 (emphasis added). Ultimately, the Court held that "[b]ecause neither the child nor his teachers had the *primary purpose* of assisting in Clark's prosecution, the child's statements do not implicate the Confrontation Clause and therefore were admissible at trial." Clark, 135 S. Ct. at 2177 (emphasis added).

The record herein indicates that Bonds' confrontation clause objection to the admission of Antoinette's out-of-court oral statements was based on her entire conversation with Showalter. Accordingly, we must uphold the trial judge's ruling that Antoinette's statements were nontestimonial so long as the primary purpose of the conversation, "in light of all the circumstances, viewed objectively . . . was [not] to 'creat[e] an out-of-court substitute for trial testimony.'" Clark, 135 S. Ct. at 2180 (second alteration in original) (quoting Bryant, 562 U.S. at 358).

Officer Showalter arrived at Antoinette's home with the limited knowledge that an assault had occurred and that a weapon was involved. He questioned Antoinette in the informal setting of her home at a time when her demeanor was, as Showalter described, "scared," "shaky," "wide-eyed" and "dazed." All the while, she repeatedly told Showalter that Bonds was "going to kill [her]." Neither

Antoinette nor Showalter knew Bonds' whereabouts or whether he would return to her house.

In this context, even though the police were present, it was objectively reasonable for Antoinette to believe that Bonds posed a continuing threat to her and that her statements to Showalter would aid in resolving this ongoing emergency. See Bryant, 562 U.S. at 372-74. In addition, it was objectively reasonable for Showalter to believe that his questioning of Antoinette would aid in locating Bonds and possibly prevent any continuing threat that Bonds posed to either her or the general public. See Bryant, 562 U.S. at 375-77.

In this regard, Antoinette's statements were nontestimonial on the same basis that a vulnerable child's utterances to a teacher are nontestimonial. See Clark, 135 S. Ct. at 2181. In both instances, the primary purpose of the encounter was rooted in providing protection and assistance. In neither instance was the primary purpose to acquire a substitute for trial testimony.

When the primary purpose of an encounter is something other than a desire to elicit a substitute for trial testimony, the statement that is procured is nontestimonial and "'the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause.'" Clark, 135 S. Ct. at 2180 (quoting Bryant, 562 U.S. at 359). Recognizing this, the trial judge herein ruled thoughtfully and correctly that Antoinette's statements were nontestimonial. There was no denial of Bonds' Sixth Amendment right to confrontation.

III

Bonds next contends that the trial court erred in denying his request to present his grandson, Treyvion Tucker, as a witness. We agree.

"[W]e will not disturb a trial court's rulings on a motion in limine or the admissibility of evidence absent an abuse of the court's discretion." State v. Powell, 126 Wn.2d 244, 258, 893 P.2d 615 (1995). "When a trial court's exercise of its discretion is manifestly unreasonable or based upon untenable grounds or reasons, an abuse of discretion exists." Powell, 126 Wn.2d at 258.

In State v. Cayetano-Jaimes, ___ Wn. App. ___, 359 P.3d 919, 924 (2015), we recently set forth the relevant principles of law.

> The Fifth Amendment to the United States Constitution and article I, section 3 of the Washington Constitution guarantee that "[n]o person shall be deprived of life, liberty, or property, without due process of law." This right to due process includes the right to be heard and to offer testimony. Rock v. Arkansas, 483 U.S. 44, 51, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987) (quoting In re Oliver, 333 U.S. 257, 273, 68 S. Ct. 499, 92 L. Ed. 682 (1948)). The accused's right to due process "is, in essence, the right to a fair opportunity to defend against the State's accusations." Chambers v. Mississippi, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973). And the right "to call witnesses in one's own behalf [has] long been recognized as essential to due process." Chambers, 410 U.S. at 294. "Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process." Washington v. Texas, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967).

However, a criminal defendant's right to present a defense is not absolute. Montana v. Egelhoff, 518 U.S. 37, 42, 116 S. Ct. 2013, 135 L. Ed. 2d. 361 (1996); State v. Maupin, 128 Wn.2d 918, 924-25, 913 P.2d 808 (1996). The trial court can refuse to admit the testimony of a witness "where there is a showing of

intentional or tactical nondisclosure, willful violation of a court order, or other unconscionable conduct." In re Detention of Henrickson, 92 Wn. App. 856, 865, 965 P.2d 1126 (1998), aff'd, 140 Wn.2d 686, 2 P.3d 473 (2000); accord Taylor v. Illinois, 484 U.S. 400, 415, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988).

The record herein indicates that, by the time Bonds requested to present Tucker as a witness, the trial court had ordered the exclusion of all witnesses from the courtroom and that Tucker had sat in the courtroom gallery for at least portions of an evidentiary hearing wherein he heard the substance of police testimony that would be admitted at trial. As a result, the trial judge barred Bonds from calling Tucker as a witness, citing "a gross violation of the motion in limine to exclude all witnesses."

The trial judge's ruling was not sound. Tucker identified himself by a different name, Marcus Mayers, on May 19 when police officers responded to the scene. His true identity, Treyvion Tucker, was only revealed during a break in the evidentiary hearing when Tucker approached Bonds' counsel in the restroom. Consequently, Bonds' counsel was unaware that Tucker was a potential witness at the commencement of the evidentiary hearing. Moreover, contrary to the trial judge's characterization, Tucker's status as a layperson suggests that, at most, he may have understood that he was a witness to the event. However, at the time he first approached Bonds' lawyer, no one had listed or considered Tucker to be a potential trial witness. Thus, although Tucker was intentionally present in the courtroom, he did not intentionally or willfully violate the court order. Indeed, no lawyer, nor Tucker himself, had any reason to know that the trial court's order

applied to him. Because Tucker's status as a potential witness was unknown to either the lawyers or to Tucker himself at the time that he seated himself in the gallery, and because there is no indication that Tucker was aware of the trial judge's ruling, the trial judge abused his discretion in finding that there was a willful violation of the order excluding witnesses from the courtroom. Neither attorney Underwood nor Tucker were shown to have willfully violated the order.

IV

However, Bonds has not demonstrated that he was prejudiced by this erroneous ruling. Each of Tucker's statements that Bonds sought to admit would have been inadmissible at trial. Accordingly, Bonds fails to establish any prejudice resulting from the trial court's refusal to admit Tucker's testimony and, thus, there was no Fifth Amendment due process violation or denial of his Sixth Amendment right to present a defense.[13]

A criminal defendant's right to present a defense extends to "'relevant evidence that is not otherwise inadmissible.'" State v. Mee Hui Kim, 134 Wn. App. 27, 41, 139 P.3d 354 (2006) (quoting State v. Rehak, 67 Wn. App. 157, 162, 834 P.2d 651 (1992)). Indeed, "a criminal defendant has no constitutional right to have irrelevant evidence admitted in his or her defense." State v. Hudlow, 99 Wn.2d 1, 15, 659 P.2d 514 (1983).

Evidence is relevant where it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable

---

[13] "We review constitutional claims de novo, as questions of law." Cayetano-Jaimes, 359 P.3d at 924.

- 24 -

or less probable than it would be without the evidence." ER 401. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." ER 403. Moreover, a trial court properly excludes evidence that is "remote, vague, speculative, or argumentative because otherwise 'all manner of argumentative and speculative evidence will be adduced,' greatly confusing the issue and delaying the trial." State v. Kilgore, 107 Wn. App. 160, 185, 26 P.3d 308 (2001) (quoting State v. Jones, 67 Wn.2d 506, 512, 408 P.2d 247 (1965)), aff'd, 147 Wn.2d 288, 53 P.3d 974 (2002); see also Mee Hui Kim, 134 Wn. App. at 42; State v. Donahue, 105 Wn. App. 67, 79, 18 P.3d 608 (2001).

A defendant seeking to admit challenged testimony bears the burden to "at least make some plausible showing of how [a witness's] testimony would have been both material and favorable to his defense." United States v. Valenzuela–Bernal, 458 U.S. 858, 867, 102 S. Ct. 3440, 73 L. Ed. 2d 1193 (1982). Evidence is material if the fact to be proved "'is of consequence in the context of the other facts and the applicable substantive law.'" State v. Sargent, 40 Wn. App. 340, 348 n.3, 698 P.2d 598 (1985) (quoting 5 K. TEGLAND, WASHINGTON PRACTICE: EVIDENCE § 82, at 168 (2d ed.1982)). Evidence is favorable if it "'might influence the determination of guilt.'" Taylor, 484 U.S. at 408 (quoting Pennsylvania v. Ritchie, 480 U.S. 39, 56, 107 S. Ct. 989, 94 L. Ed. 2d. 40 (1987)).

- 25 -

At the time that Bonds' counsel requested that Tucker be added as a witness, he made the following vague offer of proof:

> There were three -- four statements that Treyvion said that I was particularly interested in. One, he was in the house when the police arrived, that Antoinette hid because she had a warrant. Everything that Veatrice said was a lie. Antoinette did not want to give a statement until after Veatrice did, and then Antoinette reluctantly gave a statement.

It is necessary to examine each of these statements to determine the materiality and probative value of Tucker's anticipated testimony. First, the fact that Tucker was present at the house, by itself, is of unclear relevance. Tucker's presence at the scene of the alleged crime, in and of itself, makes no fact of consequence more or less probable. See ER 401. In addition, the jury heard Jordan and Tate testify at trial regarding the fact that Tucker was present at the house. In this regard, Tucker's testimony regarding his presence would have been – at best – cumulative. Cumulative evidence may be properly excluded. See ER 403. Second, the proposed testimony that Antoinette hid because she had a warrant suffers from two difficulties: (1) the trial court had already excluded any reference to such a warrant,[14] and (2) the statement does not explain Tucker's basis of personal knowledge, i.e., how he *knew*, rather than speculated, about either the existence of Antoinette's warrant or her motive for hiding in the closet. Third, the proposed testimony that "[e]verything that Veatrice said was a lie" constitutes nothing more than testimony regarding the credibility of another

---

[14] The record indicates that the trial judge had already determined, pursuant to ER 404, that he would not permit any evidence to be introduced that referenced Antoinette's prior warrant because it was prohibited evidence of a prior bad act.

No. 73967-1-I/27

witness – which is prohibited. State v. Binh Thach, 126 Wn. App. 297, 312, 106 P.3d 782 (2005) (citing State v. Carlson, 80 Wn. App. 116, 123, 906 P.2d 999 (1995)). Fourth, the proposed testimony that "Antoinette did not want to give a statement until after Veatrice did" also suffers from a lack of personal knowledge. It does not explain how Tucker *knew*, rather than speculated, that this was so. Nor, given the testimony regarding her emotional state, is it clear how this testimony, even if true, was necessarily favorable to the defense. Finally, the proposed testimony that, "Antoinette reluctantly gave a statement" added nothing, was consistent with police testimony that it was difficult for them to get Antoinette to speak, and, thus, was – at best – cumulative and subject to exclusion. See ER 403.

Taken as a whole, Tucker's testimony was merely to be that other witnesses testified untruthfully. This does not establish its materiality. See State v. Thomas, 8 Wn.2d 573, 580, 113 P.2d 73 (1941) ("Bad character should be shown by general reputation, not by private opinion of the impeaching witness."); State v. Walden, 69 Wn. App. 183, 185, 847 P.2d 956 (1993) ("'Washington cases have held generally that weighing the credibility of a witness is the province of the jury and have not allowed witnesses to express their opinions on whether or not another witness is telling the truth.'" (quoting State v. Casteneda-Perez, 61 Wn. App. 354, 360, 810 P.2d 74 (1991))).

Because "[w]e may affirm the trial court on any basis the record supports," State v. Olmos, 129 Wn. App. 750, 755, 120 P.3d 139 (2005), we conclude that, even though the trial judge's ruling was erroneous, Bonds failed to make the

- 27 -

requisite showing that Tucker's testimony would have been material and favorable. Thus, Bonds is not entitled to appellate relief.

Affirmed.

We concur: